**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. LISA BLACKSHEAR | ) | |
| | ) | |
| STATE OF GEORGIA<br>ex rel. LISA BLACKSHEAR, | ) | |
| | ) | |
| Plaintiff-Relator, | ) | Case No. _____ |
| | ) | <u>JURY TRIAL DEMANDED</u> |
| v. | ) | <u>FILED UNDER SEAL</u> |
| | ) | |
| NORTHSIDE HOSPITAL, INC. D/B/A | ) | |
| NORTHSIDE HOSPITAL ATLANTA | ) | |
| WOMEN'S CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

1.     Lisa Blackshear brings this action on behalf of herself, the United States of America, and the State of Georgia against Defendant Northside Hospital, Inc. d/b/a Northside Hospital Atlanta Women's Center ("Northside"), for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and of the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168.1 *et seq.* (collectively, the "False Claims Act").

2.     Northside falsely upcodes claims submitted to Georgia Medicaid contractors for newborn inpatient stays when billing. The newborns do not receive the level of care being billed, nor, even if it were provided, would the

516f3ab2d29d277e

level of care be medically necessary to treat the newborns' conditions.

3.      Northside also falsifies supporting patient records by having programmed its electronic health records system to insert language indicating criteria have been met to support the higher level of care even when this is not true.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331, 1345.

5.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as Defendant transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## MEDICAID CARE MANAGEMENT ORGANIZATIONS

6.      Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes the Medicaid program, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

7.      Medicaid managed care provides for the delivery of Medicaid health benefits and additional services through contracted arrangements between

state Medicaid agencies and care management organizations (CMOs) that accept a set per member per month (capitation) payment for these services.

8.    Medicaid may act as a primary payer or a "secondary payer," meaning that it will pay costs that the primary payer does not, including deductibles and copayments.

## PARTIES

9.    Defendant Northside Hospital, Inc. d/b/a Northside Hospital Atlanta Women's Center ("Northside") operates at a principal office address of 1000 Johnson Ferry Rd., Atlanta, GA 30342.

10.    Northside operates Level III Neonatal Intensive Care Units (NICU) a/k/a Special Care Nurseries (SCN) at its Atlanta, Cherokee, Forsyth, and Gwinnett locations.

11.    SCNs are for babies with complex needs, including 24-hour staffing with extensive care teams and access to specialized tests and procedures.

12.    Some newborns are born at Northside with medical issues that are not significant enough to warrant admission to an SCN or the NICU. These babies remain in the general nursery and receive additional attention, and they may require a longer stay, including after the mother is discharged from the hospital.

13.     Relator Lisa Blackshear worked for Northside as a Case Review Specialist (utilization review nurse) for Care Coordination Services from September 2013 to March 2021. She worked in a centralized office that handled the utilization review for the Atlanta campus.

## CODING FOR NEWBORNS

14.     When a newborn enters this world in a hospital setting, they become an inpatient. They arrive with varying levels of wellbeing, which can change over the course of their stay, and, thus, they require varying "levels of care."

15.     Levels of care have different meanings depending on whether the hospital is following InterQual, Milliman, American Academy of Pediatrics (AAP), or other classification systems.

16.     At all times relevant to this action, Northside used the InterQual criteria to determine medical necessity for levels of care.

17.     Georgia Medicaid also primarily relies upon the InterQual criteria when determining which level of care is medically necessary and thus properly billed.

18.     Under the InterQual system, full-term babies with no issues are classified as "well baby" level of care. Level I is then used to represent the least sick newborns, with increasing levels of severity up to Level IV.

19.     Relator's job responsibilities included reviewing these designations of

levels of care.

20.   For some CMOs, such as Amerigroup, newborns are billed under a DRG code, which pays a single payment for their entire stay:

- DRG 790 is used for an extremely immature babies;
- DRG 791 is used for a premature baby with major problems;
- DRG 792 is used for a premature baby with no major problems;
- DRG 793 is used for a full-term baby with major problems;
- DRG 794 is used for a baby with other significant problems; and
- DRG 795 is used for a full-term healthy newborn.

21.   For other payors, such as WellCare, newborns are billed according to a Revenue Code, or "Rev Code," that corresponds with the level of care.

*Levels of Care*

22.   Babies with no problems are considered "well babies."

23.   Babies with minor issues require Level I care. This level of care is for physiologically stable neonates who are at least 35 weeks gestational or postmenstrual age, weigh at least 2000 grams, and require evaluation and observation for conditions with low risk for complications or normal newborn care. Level I care also includes neonates who have transferred from a higher level of care or who have been readmitted with conditions such as failure to thrive.

24.    Level II through Level IV care reflect much sicker babies and result in increasing reimbursements.

25.    Level II care, for example, is for **moderately ill** neonates who also may be recovering from an acute illness and no longer require intensive support. **These newborns require moderately complex interventions**, or have conditions such as apnea of prematurity, the inability to maintain body temperature, or the inability to take oral feedings.

26.    At Northside, it is the role of case review specialists such as Relator to determine the appropriate code based on the level of care the newborn is being provided. To aid in this task, they enter information from the patient's file into an InterQual platform, which indicates whether level of care criteria are or are not met.

## FACTUAL ALLEGATIONS

27.    Some newborns are born with certain medical issues that are too insignificant to warrant admission to the NICU but that do require additional attention or a longer stay in the general nursery after the mother is discharged from the hospital.

28.    For example, until February 2021, Relator would mark babies in the latter category as "baby stay after mom d/c" in the Ad Hoc system, which is used to communicate this information to the business office. Relator would

also note in the details section at the bottom of the communication that the baby was not admitted to the NICU.

29.    The business office then uses this information, as necessary, to obtain authorizations for the appropriate levels of care.

30.    On February 18 and 19, 2021, Kenya Campbell—Operations Manager of Care Coordination (for all Northside campuses)—emailed Relator and others involved with utilization review, care coordination, and coding about a new policy to be implemented with regards to Medicaid CMOs:

> We are currently notifying the BO [billing office] when a baby is detained or in TCN [transitional care nursery] and is no longer a "well baby" but is indeed a "sick baby". The problem is the CMOs (Amerigroup, Wellcare, Care Source) are not paying at the higher DRG for a sick baby. We have to adjust ou[r] process a little and instead of just stating that these babies are detained after mom is d/c'd, we now have to click baby is admitted to the SCN (this is not say that baby is physical in SCN but is addressing LOC). So as of 2/19/21 please request to the business office in any detained baby that is a CMO (Amerigroup, Wellcare, Care Source) as SCN. Even if the baby is in Level I newborn nursery or Transitional Care nursery. Any sick baby (anything outside of normal including r/o sepsis,[1] phototherapy, observation for withdrawal) please request authorization for Level II – REV 172 and bill at REV 172 and complete the review. [sic]

31.    In other words, beginning approximately February 19, 2021, Northside was instructing its utilization review team to indicate that any baby that

---

[1] "r/o" means "ruling out" – in other words, basic blood tests for an asymptomatic neonate to rule out sepsis.

receives additional treatment in the general nursery to be marked as "Baby Admit to SCN" even though the baby was not admitted to an SCN.

32.     This selection was then to be communicated to the business office through Ad Hoc, who would in turn seek authorization for Level II care even though the baby was not receiving Level II care.

33.     Once authorization was received, Northside would submit claims for the baby's care under a "sick baby" code that the CMOs had—according to Campbell—been previously rejecting.

34.     In response to some questions from one of the care coordinators, Campbell and Susan Fucito—Revenue Cycle/UM Manager—clarified that the Level II code was to be used for any day that the baby received "any care outside of the normal baby newborn healthy stay regardless of the length of time that the baby is receiving the care."

35.     Fucito explained that this was because they were seeking the higher reimbursement associated with Level II care:

> For the CMO's (Amergroup, Wellcare, Caresource, Peachstate) that pay on the DRG, request authorization for sick baby DRG – we are billing all sick the babies REV 172 that considered "sick" and not a normal newborn. You may request REV 172, but you are really asking for short stay sick baby authorization since the case pays on the DRG and not the per diem revenue code. [sic]

36.     Thus, Campbell and Fucito acknowledged that this falsity was

necessary, and thus material, to the CMOs reimbursement decisions.

37.    Furthermore, false statements made to obtain these authorizations are material to the resulting claims for payment.

38.    On or about February 18, Relator objected to Campbell and the Atlanta Care Coordinator supervisor Giselle Windham that she believed it was "not right" and "illegal" to enter false information into the patient charts and that she was "not comfortable" doing so.

39.    Campbell explained that it was appropriate because it was reflecting the level of care the patient was receiving, and so it did not matter that the newborn was not actually in the NICU.

40.    Relator was not convinced, and so she continued to chart the way she always had, marking the more accurate selection that the baby stayed in the general nursery after the mother's discharge.

41.    Relator subsequently looked at some of the Ad Hoc information for the patients in question and saw that Kenya Campbell had gone in behind her and changed the entries to indicate admission to the SCN.

42.    Campbell had also marked an option for "SCNII: SCN-LVL II-UB Billing Code 172."

43.    After this rule change and Campbell's edits to her Ad Hoc entries, nurses from the CMOs began calling Relator and asking her for patients'

clinicals to support a Level II NICU stay. Relator, of course, did not have any such documentation to provide. These calls evince that the business office was in fact seeking preauthorization for Level II care for these patients who did not meet the medical necessity criteria.

44.     On March 11, 2021, Campbell emailed Relator again about following this process for all "sick and sick detained babies," noting that "[t]he problem is the CMOs (Amerigroup, Wellcare, and Care Source, etc) are not paying at the higher DRG for a sick baby. We have to adjust our process a little to bill at the correct rate." Accordingly, for any sick baby, no matter the severity of the condition, Northside's new policy was to "request authorization for Level II – REV 172 and bill at REV 172 and complete the review."

45.     Relator still refused.

46.     On March 19, Northside fired Relator.

*Cerner EHR Auto-Populates Patient Notes with their having met InterQual Criteria*

47.     As discussed above, when a utilization review nurse entered criteria into Northside's InterQual platform, it would tell the nurse whether the patient met the requirements for a level of care.

48.     In 2020, Northside programmed its electronic health records software so that when the nurses conducted an InterQual review, it would auto-

populate the patient records with a boilerplate statement about the patient meeting the criteria for level of care.

49.    This same statement would be auto-populated regardless whether the patient *actually* met the criteria or not.

50.    Accordingly, the patient records include false statements to support the medical necessity of patient stays and levels of care.

51.    Relator and the other utilization review nurses were instructed never to share the actual outcomes of the InterQual process with nurses from the CMOs or other insurance companies.

## CMO CODING REGULATIONS AND POLICIES

52.    The most basic reimbursement requirement under Medicaid is that the service or item provided must be reasonable and medically necessary. *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme.").

53.    Section 903.6, Part II, Policies and Procedures for Hospital Services, states that Georgia Medicaid only covers services that are medically appropriate and necessary and that to determine appropriateness of inpatient admission, inpatient-qualifying criteria designated by the Division

[of Medical Assistance], such as InterQual, will be used by the hospital….
"based on information about the patient's medical condition available at the
time of presentation."

54.     Northside's instructions that "anything outside of normal" supports
medical necessity for Level II care is baseless and does not comport with
InterQual's medical necessity criteria.

55.     There exists a "well baby" or general or transitional nursery level of
care that applies to most healthy newborns.

56.     Then, there is a Level I level of care that more closely meets these
criteria of requiring additional levels of care to address minor issues.
Northside essentially is suggesting that Level I may be passed over in all
instances so that it can code these stays under Level II.

57.     But these newborns do not meet the InterQual criteria of being
"moderately ill," and the examples of care being given by Campbell are not
"moderately complex interventions."

58.     For example, Relator estimates that the vast majority of "sick babies"
she reviewed remained in the hospital due to hyperbilirubinemia. This is a
common condition, and so, as explained below, phototherapy is generally
considered a Level I level of care issue.

*Amerigroup*

59.    Under Amerigroup's Georgia Medicaid NICU policy, CG-MED-26, levels of care are associated with the medically necessary services being provided, not the facility designations.

60.    Under CG-MED-26, Level I Care is medically necessary for "neonates who are medically stable but require surveillance/care at a higher level than provided in the general nursery." Included in its list of examples are "Hyperbilirubinemia requiring phototherapy" and "Initial sepsis evaluation (CBC, blood culture for an asymptomatic neonate)," two of the conditions that Campbell listed as warranting Level II care. For the latter, Level II care is only medically necessary if in addition to the initial sepsis evaluation, an antibiotic treatment is provided.

61.    The third condition noted by Campbell—"observation for withdrawal— is listed as an example of the "general nursery" level of care and does not qualify for even the lowest level of SCN care: "Observation for development of signs of neonatal abstinence syndrome in an infant with known antenatal exposure to opioids and benzodiazepines."

62.    Amerigroup's policy thus contradicts Northside's position that "anything outside of normal" supports a Level II code, which is intended for newborns "with physiological immaturity combined with medical

-13-

instabilities." The basic conditions identified by Campbell constitute medical

necessity for well baby or Level I care, not Level II care.

*WellCare*

63.   WellCare's Georgia Medicaid NICU policy, CPP-163, instructs that

"[h]ospitals are expected to bill for newborn care, whether in the regular

newborn nursery or in the neonatal intensive care nursery, using industry

standard hospital revenue codes."

64.   Based on CPP-163, WellCare reimburses based on the revenue code,

not a DRG. Unlike Amerigroup, WellCare directly associates NICU facility

levels (rather than the level of care) with the Revenue Codes:

> WellCare authorizes NICU Facility Levels by assignment of an
> authorized revenue code(s) to a provider for the NICU room and
> board stay. If a NICU Facility Level is submitted on the UB-04
> claim form with a revenue code that is at a higher level of care
> than the revenue code authorized by WellCare, the
> reimbursement for the NICU claim will be at the NICU Facility
> Level authorized.

65.   Rev Code 170 is for a regular baby in a general nursery. Rev Code 171

is associated with a Level 1 NICU stay, defined as a nursery for healthy, full

term babies that require some minor stabilization. This designation most

closely fits Northside's description of babies with minor ailments that can be

treated or observed in the general nursery.

66.   Rev Code 172 is associated with a Level II NICU, which is for "babies

born at greater than 32 weeks gestation or who are recovering from more serious conditions."

67.     Northside possesses NICU Level III authorization, and so billing under Rev Code 172 is authorized by WellCare. The falsity perpetrated by Northside misleads WellCare into believing that the babies are actually admitted to the NICU, which is directly material to its decision to pay under this higher revenue code.

*Peach State Health Plan*

68.     According to the Peach State Health Plan website:[2]

> All policies found in the Peach State Health Plan Clinical Policy
> Manual apply to Peach State Health Plan members. Policies in
> the Peach State Health Plan Clinical Policy Manual may have
> either a Peach State Health Plan or a "Centene" heading.  Peach
> State Health Plan utilizes InterQual® criteria for those medical
> technologies, procedures or pharmaceutical treatments for which
> a Peach State Health Plan clinical policy does not exist… In
> addition, Peach State Health Plan may from time to time
> delegate utilization management of specific services; in such
> circumstances, the delegated vendor's guidelines may also be
> used to support medical necessity and other coverage
> determinations. Other non-clinical policies (e.g., payment
> policies) or contract terms may further determine whether a
> technology, procedure or treatment that is not addressed in the
> Clinical Policy Manuals or InterQual® criteria is payable by
> Peach State Health Plan.

---

[2] This language and all applicable policies can be found at
https://www.pshpgeorgia.com/providers/resources/clinical-payment-
policies.html (last visited April 19, 2021).

69.     As discussed above, the InterQual criteria associate Revenue Code 170 with well babies, Revenue Code 171 with newborns receiving Level I Care, and Revenue Code 172 for newborns receiving Level II Care, i.e., newborns that require moderately complex interventions.

70.     The Peach State Clinical Policy Manuals further evince that the babies with conditions identified by Campbell do not meet the medical necessity requirements for Level II care or billing.

71.     Clinical Policy CP.MP.85: Neonatal Sepsis Management states that the management of neonatal sepsis is medically necessary at a Level II (Rev Code 172) if an asymptomatic newborn is on 48 hours of antibiotics pending blood culture results. If the newborn tests negative or tests positive but remains asymptomatic is more appropriately coded as transitional care or Level I nursery (Rev Code 171).

72.     This suggests that, like Amerigroup, if the newborn is tested but not given antibiotics, Level II care is inappropriate.

73.     Clinical Policy CP.MP.86: Neonatal Abstinence Syndrome Guidelines states that observation of asymptomatic infants is medically necessary at a transitional level or Level I nursery for 4-7 days, unless the infant is assessed and treated using the "Eat, Sleep, Console (ESC) approach, depending on the drugs used during pregnancy." The ESC approach is a more in-depth

assessment tool used to evaluate the infant's ability to eat, sleep, and be consoled, and it requires a different manner of care for the infant—the mere fact that an infant is being observed for signs and symptoms of withdrawal does not qualify for Level II care.

74.    Clinical Policy CP.MP.150: Home Phototherapy for Neonatal Hyperbilirubinemia states that phototherapy in the home is medically necessary when an infant is "currently inpatient and ready for discharge except for needing treatment for elevated bilirubin." If "bilirubin levels are acceptable based on hours of life and risk factors (as discussed in CP.MP.150), the newborn should be discharged. See CP.MP.81.

**COUNT I**
**VIOLATIONS OF 31 U.S.C. § 3729 – FEDERAL FALSE CLAIMS ACT**

75.    Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

76.    As set forth above, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

77.    As set forth above, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

78.    Due to Defendant's conduct, the United States Government has suffered

substantial monetary damages and is entitled to recover treble damages and a

civil penalty for each false claim. 31 U.S.C. § 3729.

79.    Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31

U.S.C. § 3730(d)(1).

### COUNT II
### VIOLATION OF GA. CODE ANN. § 49-4-168.1 – GEORGIA FALSE MEDICAID CLAIMS ACT

80.    Relator hereby incorporates and realleges herein all other paragraphs

as if fully set forth herein.

81.    As set forth above, Defendant knowingly presented or caused to be

presented to the Georgia Medicaid program false or fraudulent claims for

payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

82.    As set forth above, Defendant knowingly made, used, or caused to be

made or used, false records or statements material to false claims, in

violation of O.C.G.A. § 49-4-168.1(a)(2).

83.    Due to Defendant's conduct, the State of Georgia has suffered

substantial monetary damages and is entitled to recover treble damages and

a civil penalty for each false claim. Ga. Code Ann. § 49-4-168.1.

84.    Relator is entitled to reasonable attorneys' fees, costs, and expenses.

Ga. Code Ann. § 49-4-168.2(i).

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant:

(a) awarding the United States and state of Georgia treble damages

sustained by them for each of the false claims;

(b) awarding the United States and state of Georgia a maximum civil

penalty for each of the false claims, records, and statements;

(c) awarding Relator the maximum share of the proceeds of this

action and any alternate remedy or the settlement of any such

claim;

(d) awarding Relator litigation costs and reasonable attorneys' fees;

(e) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues

and counts triable as of right before a jury.

Respectfully submitted,

Julie Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3355 Lenox Road, Suite 660
Atlanta, GA 30326

-19-

Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com